IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WALTER L. ROTHGEB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:11-cv-175-CSC |
| | ) | (WO) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

On July 11, 2007, the plaintiff, Walter L. Rothgeb, protectively filed a Title II[1]

application for a period of disability and disability insurance benefits.  (R. 22, 24).  This

claim was denied initially on October 10, 2007.  (R. 67).  Thereafter, Rothgeb filed a written

request for hearing on November 20, 2007 (20 C.F.R. 404.929 *et seq*. & 416.1429 *et seq*).

(R. 67).  On August 26, 2009, Administrative Law Judge ("ALJ") Linda J. Helm held a video

hearing (20 C.F.R. 404.936(c) and 416.1436(c)).  Following the hearing, the ALJ also denied

---

[1]There appears to be some confusion on the part of the Commissioner as to whether Rothgeb also
filed an application for supplemental social security income benefits under Title XVI.  (Commissioner's
Brief, Doc. 13 p. 1 (citing R. 310-11 (a previous SSI application from October 2004 that does not form the
basis of this appeal); R. 11; R. 321).  The record supports Rothgeb's assertion that he filed only for disability
insurance benefits under Title II.  (Plaintiff's Brief, Doc. 12 p. 1; R. 80; R. 329).  In any event, however, the
existence of a Title XVI application for SSI benefits would not alter the analysis or the result in this case.
*See Sullivan v. Zebley*, 493 U.S. 521,525 n.3 (1990) ("The regulations implementing the Title II disability
standard, 42 U.S.C. § 423(d) . . . and those implementing the identical Title XVI standard, § 1382c(a)(3) .
. . are the same in all relevant respects. Compare 20 CFR §§ 404.1520-1530 with §§ 416.920-930 (1989));
*Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A) ("To be entitled either to Social Security disability
insurance benefits, 42 U.S.C.§ 423, or supplemental income benefits, 42 U.S.C. § 1382, a claimant must
establish that she is disabled. The statutory test for each of these benefits is the same.").

the claim.  (R. 8).  The Appeals Council rejected a subsequent request for review on January 22, 2011.  (R. 4).  The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[2]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A) a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

(1)  Is the claimant presently unemployed?
(2)  Is the claimant's impairment severe?
(3)  Does the claimant's impairment meet or equal one of the specific

---

[2]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[3]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

2

impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4)  Is the claimant unable to perform his or her former occupation?
(5)  Is the claimant unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ, but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

---

[4]*McDaniel v. Bowen,* 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  *See Sullivan v. Zebley*, 493 U.S. 521,525 n.3 (1990). Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Sullivan*, 493 U.S. at 525 n.3; *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

3

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A.  Introduction.**  Rothgeb was born on July 18, 1972, and was 37 years old at the time of the administrative hearing in this case.  (R. 22, 332).  Rothgeb has completed the tenth grade and has not obtained a GED. (R. 332).

In 1999, Rothgeb was diagnosed with bipolar disorder.  (Tr. 222).  In addition, he has a past history of substance abuse, but he has not taken illegal drugs (except for smoking one "joint") since 2006.  (R. 157, 166, 167, 175, 184, 223, 238, 244, 256, 338-39).  He contends that his "condition" has been consistently severe since 2003 or 2004.  (R. 335).  He alleges that he has been disabled since  June 1, 2006.[5]

Rothgeb was last employed in October 2004 (R. 75, 79, 92, 110, 332-33), when he washed dishes, cooked, and cleaned floors in his position a kitchen worker in a restaurant. (R. 92, 103-04, 334).  He left his last job because he lost his temper and threw "a couple of pots" at a coworker.  (R. 335, 339).  Thereafter, he received medical treatment for bipolar disorder.  (R. 335-36).

At the time he filed his application for social security benefits, Rothgeb lived with his wife, but he has since separated from his wife and moved into his parents' home.  (R. 100-02, 332).  Rothgeb testified at the August 26, 2009 administrative hearing in this case that his

---

[5]In a May 2006, decision, an ALJ found Plaintiff disabled for a closed period which began on August 1, 2004, and which ended (due to medical improvement after Rothgeb received medical treatment for depression and bipolar and borderline personality disorders) on February 19, 2006. (R. 29-39). That decision is not at issue in the present case.

4

bipolar disorder prevents him from "be[ing] around a lot of people at one time." (R. 335). Rothgeb testified that he spent his time alone in a dark room sitting, sleeping, and watching television. (R. 335, 338). He also testified that he stopped playing video games in 2005 when he sold his video game console because he "couldn't concentrate" on the games. (R. 338). However, in a 2008 mental health board intake assessment, "video games" and "watch[ing] TV" were listed as Rothgeb's recreational and leisure interests. (R. 149). A 2007 psychiatric review stated: "[Rothgeb] spends time playing video games and watching TV. . . . In spare time he likes T.V. and video games." (R. 218).  In a September 2007 report, a consulting psychologist noted: "Socially, the claimant functions in a somewhat isolated manner. The claimant spends the majority of their day playing Playstation [video games], watching TV, and doing chores." (R. 223).  On an August 2007 questionnaire as part of the application for social security benefits, Rothgeb's wife described Rothgeb's activities in an "average day" as follows: "plays video games, watches TV." (R. 98, 112).  She described his spare time activities as "TV.  Vid[e]o games."  ( R. 99).

Rothgeb stated that he was receiving counseling and taking medication that helped him sleep and "help[ed] [him] control some of [his] anger and some of the depression."  R. 335-36.  Rothgeb said that he lost his temper with his parents "maybe ten times" in the month prior to the hearing, and that he was not violent.  (R. 336-37).

Rothgeb met his wife four years prior to the hearing in this case and he separated from her two years prior to the hearing.  (R. 337).  He testified that, "except for maybe one or two

people," he interacted mostly with family and he had no friends during the six years preceding the hearing. (R. 337).

Upon questioning, a vocational expert ("VE") testified that Rothgeb's past work as a kitchen worker is classified as "medium and unskilled" work. (R. 344). The VE also testified that Rothgeb had past relevant work as a fast-food worker, which is classified as light and unskilled. (Tr. 344). According to the VE, Rothgeb's past jobs as a kitchen worker and fast-food worker were performed as they are generally performed in the national economy. (R. 344). The VE testified as follows in response to questions from the ALJ:

> ALJ: Let's assume we have an individual with the same work history as you've already described for Mr. Rothgeb. And let's assume that the individual is limited in the following fashion: with no exertional limitations, but could not work around unprotected heights or dangerous moving equipment, no more than occasional or casual contact with the public, no complex or detailed instructions, he could only do goal-oriented work and must avoid production pace work. With these restrictions, in your opinion, could such an individual perform any of the work that Mr. Rothgeb has performed in the past?

> VE: Yes, ma'am. Could do past work as a kitchen work[er]. Could not do fast food work, as it would require more than occasional contact with the general public.

> ALJ: Now, imagine the same restrictions as were previously identified, but now would require . . . two to three days out of a week where they would be late to work or would have to leave the work station early or would not even go to work two or three days out of a week. Would there be jobs available? Would they be able to do past relevant work or any other work?

> VE: No, ma'am. Could not do past relevant work or any other work. That level of unpredictability and would also be a disruption in production and pace in the workplace. I believe it would be more than employers

would normally accommodate for entry level work, so there's be no work for that individual.

(R. 344-45).

At the close of the hearing, the ALJ left the record open for fourteen days to allow for supplementation of the record with a report from a psychiatric appointment Rothgeb would be attending after the hearing.  (R. 345-46).  After the hearing, Rothgeb supplemented the record with documentation from the treating psychiatrist, Dr. Serravezza.  (R. 143-46).  Dr. Serravezza noted that Rothgeb had "mild" deterioration in personal habits, in his ability to ask simple questions or request assistance, to make simple work-related decisions, to respond appropriately to changes in the work setting, to be aware of normal hazards and to take appropriate precautions, to understand, remember, and carry out simple[6] instructions, and to understand, remember, and carry out repetitive tasks.  (R. 144-46).  Dr. Serravezza noted that Rothgeb had "moderate" constrictions of his interests, "moderate" restriction in his daily activities (e.g., ability to attend meetings (church, school, lodge, etc.), work around the house, socialize with friends and neighbors, etc.),  and "moderate" limitations his ability to interact appropriately with the general public, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (R. 144-46).  Dr. Serravezza noted that Rothgeb had "marked" limitations in his ability to get along with co-workers or peers,

---

[6]Dr. Serravezza's notes show that she also initially circled the word "marked" to describe Rothgeb's estimated degree of ability to understand, remember, and carry out simple instructions.  (R. 145).  Then she crossed out the "marked" description, wrote "Error" above it, and circled the term "mild" to describe Rothgeb's estimated degree of ability to understand, remember, and carry out simple instructions.  *Id.*

to understand, remember and carry out complex instructions, to maintain attention and concentration for extended periods of time, to sustain a routine without special supervision, to complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to respond appropriately to supervision, and to respond to customary work pressures. (R. 144-46).

## B.   The Findings of the ALJ

The ALJ found that Rothgeb has the following severe impairments: bipolar disorder, history of substance abuse disorder, and history of seizure disorder. (R. 13-14). The ALJ stated:

> The claimant has been diagnosed with and treated for bipolar disorder since before the alleged onset of disability. He also has a history of substance abuse disorder, but he not abused any substance since 2006 (Exhibit F-151). The claimant also has a history of a seizure disorder, however he has not had a seizure since 2005 (Exhibit F-78). These impairments are severe because they significantly limit the claimant's ability to perform basic work activities.

(R. 16-17).

The ALJ found that Rothgeb did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 14-16).

The ALJ found that Rothgeb

has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He cannot work around unprotected heights or dangerous moving equipment. He is

8

limited to no more than occasional or casual contact with the public. He cannot
understand, remember, and carry out complex instructions, but can understand,
remember, and carry out simple instructions. He cannot perform production
paced work, but can perform goal oriented work.

(R. 16-18).

The ALJ found that Rothgeb is capable of performing past relevant work as a kitchen

helper as actually and generally performed.  (R. 19).  The ALJ concluded, therefore, that

Rothgeb has not been under a disability since June 1, 2006.  (R. 19).

## C.  Rothgeb's Claims.

Rothgeb presents two issues for review:

1.     Rothgeb contends that the Commissioner's decision should be reversed
       because (according to Rothgeb) the ALJ's residual functional capacity
       assessment failed to incorporate the medical evidence provided by Mr.
       Rothgeb's treating physician, Dr. Serravezza, whose medical opinion
       the ALJ gave significant weight.

2.     Rothgeb contends that the Commissioner's decision should be reversed
       because (according to Rothgeb) "the ALJ mischaracterizes or
       misconstrues the record in her determination that the claimant's
       statements concerning his impairments are not fully credible."

## IV.  Discussion

## A.     Whether the ALJ erred by failing to incorporate medical evidence from Dr. Serravezza

In stating the basis for her residual functional capacity determination, the ALJ set

forth in detail Dr. Serravezza's notes as to Rothgeb's limitations and impairments.  (R. 18-

19).  The ALJ stated that she gave "significant weight" to Dr. Serravezza's assessment, and

the ALJ stated that Dr. Serravezza's assessment was "incorporated in" her findings as to

Rothgeb's residual functional capacity.  (R. 18-19).  Nevertheless, Rothgeb argues that the ALJ's residual functional capacity assessment failed to incorporate the medical evidence from Dr. Serravezza.  *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986) ("The opinion of a treating physician is to be given substantial weight in determining disability.").

Rothgeb argues that, contrary to the ALJ's residual functional capacity determination, Dr. Serravezza found that he had "marked" limitations in his ability to understand, remember, and carry out simply instructions.  (Plaintiff's Brief, Doc. 12 p. 5).  Rothgeb is simply incorrect about Dr. Serravezza's findings in this regard.  Dr. Serravezza's notes indicate that she initially circled the word "marked" to describe Rothgeb's estimated degree of ability to understand, remember, and carry out simple instructions; however, she crossed out the "marked" description, wrote "Error" above it, and circled the term "mild" to describe Rothgeb's ability to understand, remember, and carry out simple instructions.  (R. 145).  Dr. Serravezza did find that Rothgeb had "marked" limitations in his ability to understand, remember, and carry out complex instructions, which is consistent with the ALJ's determination that Rothgeb did *not* have residual functional capacity to "understand, remember, and carry out complex instructions, but [he] can understand, remember, and carry out simple instructions." (R. 16-18).  In addition, the ALJ's hypothetical to the VE instructed the VE to assume Rothgeb could not do work that involved "complex or detailed instructions."  (R. 344-45).  *See Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) ("In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must

pose a hypothetical question which comprises all of the claimant's impairments."). The ALJ's residual functional capacity assessment is fully consistent with Dr. Serravezza's findings with respect to Rothgeb's ability to understand, remember, and carry out instructions.

Rothgeb also argues that the ALJ's residual functional capacity determination did not incorporate Dr. Serravezza's findings that he had "marked" limitations in his ability to maintain attention and concentration for extended periods of time, to sustain a routine without special supervision, to respond appropriately to supervision, and to respond to customary work pressures. (Plaintiff's Brief Doc. 12 pp. 4-5; R. 144-46). However, the ALJ did expressly list these limitations in her opinion and she stated that the limitations in Dr. Serravezza's assessment were "given significant weight and have been incorporated into [Rothgeb's] residual functional capacity." (R. 19).

Nevertheless, Rothgeb argues that it would have been impossible for Dr. Serravezza's assessment to have been incorporated in the ALJ's residual functional capacity assessment, and in her questions to the VE, because the ALJ permitted Rothgeb to supplement the record with Dr. Serravezza's assessment *after* the hearing. *See Wilson*, 284 F.3d at 1227 (holding that, for the VE's testimony to be valid, "the ALJ must pose a hypothetical question [to the VE] which comprises all of the claimant's impairments."). However, as the ALJ noted in her opinion, Dr. Serravezza's assessment was "consistent with and well supported by the medical

11

evidence of record" (R. 19) which the ALJ *did* have before her[7] at the time of the hearing when she posed her hypothetical to the VE.  Moreover, at the time the ALJ wrote her opinion, she *did* have Dr. Serravezza's assessment before her and she considered it in determining that Rothgeb had

> "the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He cannot work around unprotected heights or dangerous moving equipment. He is limited to no more than occasional or casual contact with the public. He cannot understand, remember, and carry out complex instructions, but can understand, remember, and carry out simple instructions. He cannot perform production paced work, but can perform goal oriented work."

(R. 16-19).

In other words, after expressly considering Dr. Serravezza's assessment and after giving it "substantial weight," the ALJ did not find that Dr. Serravezza's assessment required her to alter the initial residual functional capacity determination that formed the basis of her hypothetical to the VE at the hearing.  Dr. Serravezza's assessment is not inconsistent with the ALJ's residual functional capacity determination, and the ALJ's residual functional capacity determination is supported by substantial evidence. Under the circumstances, the ALJ was not required to hold an additional hearing and ask the VE more questions merely because she granted Rothgeb's request (R. 345-46) to allow for supplementation of the record.  *Cf. Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1270 (11th Cir. 2007)

---

[7] *See, e.g.*, Dr. William Simpson's October 2007 Mental Residual Functional Capacity Assessment (R. 204 ("Claimant has the ability to understand, remember[,] and carry out short, simple instructions. Claimant can work in 2 hour intervals with scheduled breaks.  Frequent public contact should be limited in the workplace.")).

("The hypothetical [posed to the VE] need only include 'the claimant's impairments,'. . . not each and every symptom of the claimant." (quoting *Wilson*, 284 F.3d at 1227)).  The court will not reverse the ALJ simply for carrying out her duty to fully develop the record.  *Cf. Ingram*, 496 F.3d at 1269 ("The [ALJ] has a duty to develop the record where appropriate."). Further, because the ALJ expressly addressed and accepted Dr. Serravezza's findings, the court finds no merit in Rothgeb's assertion that the ALJ erred as a matter of law by rejecting or failing to address the findings of his treating physician.  *Id*. at 1260 (holding that the Commissioner's decision must be upheld if supported by substantial evidence and proper legal analysis).

**B.     Whether the ALJ committed reversible error by mischaracterizing or misconstruing the record in her determination that the claimant's statements concerning his impairments are not fully credible**

Citing *Flentroy-Tennant v. Astrue*, Case No. 3:07-cv-101-J-TEM, 2008 WL 876961 (M.D. Fla. Mar. 27, 2008), Rothgeb contends that the ALJ erred as a matter of law by making "numerous misstatements" which, "taken as a whole, reveal an inaccurate review of the record and inadequate support in the record."  (Plaintiff's Brief, Doc. 12 p. 9 (citing *Flentroy-Tennant,* 2008 WL 876961 at *8)).  Rothgeb points to several statements by the ALJ which he contends are so inaccurate that they demonstrate the ALJ's failure to comprehend or adequately consider the record as a whole.

First, Rothgeb argues that the ALJ mischaracterized the record when she stated:

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant states that he has racing thoughts and flight of ideas

13

(Exhibit F-152), but he is able to play video games and watch television. Additionally, at the consultative examination he was able to perform serial 7's and spell the word "gold" backwards. He could recall 5 digits forward and 3 digits backward and three words after a five minute delay. The evidence as a whole indicates that the claimant has moderate difficulties with concentration, persistence or pace.

(R. 15).

According to Rothgeb, the ALJ erred in concluding that "[t]he evidence as a whole indicates that the claimant has moderate difficulties with concentration, persistence or pace," *id*., because, in reaching that conclusion, she failed to credit Rothgeb's testimony that he stopped playing video games in 2005 when he sold his video game console to his nephew because he "couldn't concentrate" on the games. (R. 338). However, substantial evidence supports the ALJ's conclusion that Rothgeb did not stop playing video games in 2005 when he allegedly sold his video game console. Specifically, in a 2008 mental health board intake assessment, "video games" and "watch[ing] TV" were listed as Rothgeb's recreational and leisure interests. (R. 149). A 2007 psychiatric review stated: "[Rothgeb] spends time playing video games and watching TV. . . . In [his] spare time he likes T.V. and video games." (R. 218). In a September 2007 report, a consulting psychologist noted: "The claimant spends the majority of [his] day playing Playstation [video games], watching TV, and doing chores." (R. 223). On an August 2007 questionnaire as part of the application for social security benefits, Rothgeb's wife described Rothgeb's activities in an "average day" as follows: "plays video games, watches TV." (R. 98). She described his "usual daily activities" as "Watching TV. playing Vid[e]o games. Folds clothes." (R. 112). She described his spare

14

time activities as "TV. Vid[e]o games." ( R. 99).

Furthermore, regardless of Rothgeb's continued video gaming activities, the record is replete with evidence that supports the ALJ's conclusion that Rothgeb had " moderate difficulties with concentration, persistence or pace." (R. 15). For example, in addition to the evidence cited by the ALJ, the court notes that Dr. Serravezza Rothgeb had "marked" limitations in his ability to maintain attention and concentration *for extended periods of time*, but that he had only "mild" deterioration in his ability to understand, remember, and carry out simple instructions, to understand, remember, and carry out repetitive tasks, to make simple work-related decisions, to respond appropriately to changes in the work setting, and to be aware of normal hazards and to take appropriate precautions. (R. 144-46). Dr. Serravezza also found that Rothgeb had only "moderate" constrictions of his interests, "moderate" restriction in his daily activities (*e.g.*, ability to attend meetings, work around the house, and socialize with friends and neighbors), and "moderate" limitations his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (R. 144-46). Thus, as a whole, Dr. Serravezza's findings support the ALJ's conclusion that Rothgeb had moderate limitations in his ability to maintain concentration, persistence, or pace.

Accordingly, the record supports the ALJ's decision to discredit Rothgeb's testimony that he no longer played video games, and substantial evidence supports her finding that he has "moderate difficulties with concentration, persistence or pace." (R. 15). The ALJ did

15

not "mischaracterize" or "misconstrue" the record on this point.

Rothgeb argues that the ALJ also "mischaracterized" and "misconstrued" the record when she "implie[d] that Mr. Rothgeb's active participation in his treatment and the disability adjudication process renders his statements about the severity if his impairment 'not fully credible.'"   (Plaintiff's Brief, Doc. 12 p. 9).   Specifically, Rothgeb takes issue with the following paragraph of the ALJ's opinion:

> Several factors weigh against the claimant's statements concerning the severity and limiting effects of his impairments. The claimant's wife completed two Daily Activities Questionnaires on behalf of the claimant. The responses on the questionnaires are inconsistent with the treatment notes and the findings from the consultative examination. First, the claimant alleges he needs to be reminded to take care of his personal needs (Exhibit E-45), but treatment notes from South Central Alabama Mental Health show that the claimant's dress, grooming, and hygiene are appropriate (Exhibit F-153).  He also alleges that he is unable to count change (Exhibit E-44), but he was able to perform serial 7's at the consultative examination (Exhibit F-81). The claimant alleged that he is unable to pay attention as a result of his mental impairments (Exhibit E-44); however, he was able to follow instructions and complete the questions on the mental status exam at the consultative examination (Exhibit F-81). Next, the claimant stated that he is easily angered and loses his temper frequently, but treatment notes show that Dr. Seravezza has consistently rated his impulse control as fair or good (Exhibit F -I 03-1 09). The claimant alleges very limiting symptoms from his mental impairment, but he receives routine treatment and monitoring. He goes to therapy every thirty to sixty days. He has not been hospitalized or treated for decompensation during the period at issue. Finally, his prescribed medication is very conservative. He takes lithium daily and seroquil two or three times a week (Hearing Testimony). Overall, the claimant's allegations of symptoms are inconsistent with the objective findings in the medical evidence of record. Consequently, the claimant's and his wife's statements concerning the severity and limiting effects of his impairments are not fully credible.

(R. 18).

Rothgeb contends that the ALJ should not have cited evidence of "[h]is ability to attend a consultative exam and fill out a form" as "as objective medical evidence" that he his mental impairments left him "unable to pay attention." (Plaintiff's Brief, Doc. 12 p. 10). However, as this court explained above, the record is replete with evidence (including Dr. Serravezza's assessment) that supports the ALJ's conclusion that Rothgeb had "moderate difficulties with concentration." (R. 15).

Rothgeb also argues that the ALJ should not have discounted his allegation that he "needs to be reminded to take care of his personal needs" by "point[ing] out that a claimant was appropriately dressed at a doctors appointment one morning." (Plaintiff's Brief, Doc. 12 p. 10). In taking issue with the ALJ's reliance on "treatment notes from South Central Alabama Mental Health show that the claimant's dress, grooming, and hygiene are appropriate," Rothgeb himself is out of keeping with *Flentroy-Tennant*, the very case he cites in support of his argument. In *Flentroy-Tennant*, the district court considered whether "taken as a whole," the ALJ's opinion "reveal[ed] an inaccurate review of the record and inadequate support in the record." 2008 WL 876961 at * 8. In this case, "taken as a whole," the ALJ's opinion reveals thoughtful consideration of Rothgeb's claims about needing to be reminded to care for his personal hygiene, and adequate support in the record for her conclusions on this issue. For example, at step three of the analytical process, the ALJ noted:

> In activities of daily living, the claimant has moderate restriction. The claimant's reported daily activities include watching television and playing video games (Exhibit F -85). He watches cartoons and game shows and movies for four hours at a time. He has to be reminded to care for his personal

hygiene. He does not cook very often and shops for personal needs once a month.  He folds laundry and finishes chores when reminded. Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other volitional reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. The evidence of record supports a finding that the claimant has moderate limitations in activities of daily living.

(R. 14-15).

In other words, taken as a whole, and contrary to Rothgeb's characterization of the ALJ's findings, the ALJ's opinion adequately explains her finding that Rothgeb had "moderate" restrictions in activities of daily living, including the ability to care for his own personal hygiene without being reminded.  (R. 14-15). Taken as a whole, the ALJ's opinion indicates that the ALJ did give some credit to Rothgeb's allegation that "[h]e has to be reminded to care for his personal hygiene," but she also gave a detailed explanation of her conclusion that this allegation did not constitute "strong evidence in favor of finding the claimant disabled."  (R. 14-15).  Further, contrary to Rothgeb's assertions, and taking the ALJ's opinion as a whole, it is clear that the ALJ's finding of "moderate" limitations in activities of daily living (including personal hygiene activities) was not based solely on Rothgeb's ability to arrive "appropriately dressed at a doctors appointment one morning." (Plaintiff's Brief, Doc. 12 p. 10).  Rather, the ALJ expressly considered a number of factors in reaching her conclusion on this point.  The ALJ's finding with respect to Rothgeb's ability

18

to care for his personal hygiene is supported by the record as a whole, including Dr. Serravezza's findings Rothgeb had that "mild" deterioration in personal habits and "moderate" restriction in his daily activities (R. 144-46), and also including the September 2007 consultative examination by Dr. Jordan,[8] which the ALJ discussed in detail in her opinion (R. 17). The ALJ did not "mischaracterize" or "misconstrue" the record with respect to Rothgeb's ability to carry out these activities.

Rothgeb also argues that the ALJ erred in finding that Rothgeb did not have very limiting symptoms "because he is able to receive routine treatment once a month." (Plaintiff's Brief, Doc. 12 p. 10). Rothgeb misconstrues the ALJ's opinion on this point. Taking the ALJ's reference to Rothgeb's "routine treatment" in context, *see Flentroy-Tennant*, 2008 WL 876961 at * 8, it is clear that the ALJ discounted the alleged

---

[8]As the ALJ stated:
The record was supplemented by a consultative examination conducted by Randy Jordan, Psy.D. (Exhibit F-81). At the consultative examination, the claimant reported a history of angry outburst and that he quit high school because he had frequent conflicts with the vice-principal. He stated that his sleep varies from two to twelve hours per night. His appetite is fair to good. He manages his money and remembers his medication. The claimant did well on the mental status exam. His speech was understandable 100% and did not reflect pressured processes. He was able to perform serial Ts and spell the word "'gold" backwards. His memory was not compromised. He was able to identify presidents, past presidents, capitals, and the number of weeks in a year. He was able to say how items were similar and different. Paranoid delusions were not present. The claimant did not report any current auditory or visual hallucinations, although he had experienced hallucinations in the past. He also reported a history of suicidal ideation and attempts, though not since being on Lithium. Finally, the claimant's judgment was not compromised as he was able to state appropriately how to respond to common social situations such as what to do in case of fire and why we have seatbelts. *Dr. Jordan noted that the claimant's daily living skills are not compromised by intellectual or psychological function*. Socially, the claimant functions in a somewhat isolated manner. The findings from Dr. Jordan's reports support the above stated residual functional capacity.

(R. 17; R. 222-223) (emphasis added).

19

severity of Rothgeb's symptoms not because he was *able to keep an appointment* once every month or two, but because the treatment he was receiving at those sessions was "routine," his medication was "conservative," and his overall level of psychiatric care was inconsistent with the level of treatment one would expect for a patient whose symptoms were as severe as Rothgeb's allegedly were at the time of the hearing.  (R. 14-15).  The ALJ's conclusions on this issue are supported by substantial evidence, and this court will not reweigh the evidence regarding the severity of his symptoms.  *See Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991) ("[T]he scope of our review of the [Commissioner's] factual determinations is limited to whether its findings were supported by 'substantial evidence.' . . . The court need not determine whether it would have reached a different result based upon the record.").

Rothgeb also alleges that the ALJ mischaracterized and misconstrued the record with respect to his ability to maintain social relationships.  Specifically, at step three of the analytical process, the ALJ stated:

> In social functioning, the claimant has moderate difficulties. The claimant visits his parents, but likes to be by himself(Exhibit F-85). He talks to his mother on the phone daily. He testified that he gets angry easily and loses his temper, but is not violent (Hearing Testimony). He acknowledged that his medications help control his anger. He does not have any friends, but he is able to shop in public places. During the period at issue, the claimant married. Although the marriage was not ideal and they separated within a year, the fact that the claimant was able to date and then marry someone shows that he is able to form and maintain long term relationships.  Based on the claimant's statements, he has moderate difficulties in social functioning.

(R. 15).

20

According to Rothgeb, the ALJ should not have found that he is "able to form and maintain long term relationships" on the basis of his relationship with his wife. However, other evidence of family relationships and social functioning cited by the ALJ, as well as the record taken as a whole, supports the ALJ's finding of moderate limitations in social functioning. For example, Dr. Serravezza noted that Rothgeb had "moderate" restriction in his ability to attend meetings (church, school, lodge, etc.), socialize with friends and interact appropriately with the general public. (R. 144-46). Thus, *at most*, the ALJ's reliance on Rothgeb's two-year-long dating and marriage relationship (R. 337) could constitute no more than harmless error and could not serve as grounds for reversal. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that the harmless error rule prevented reversal of an ALJ's decision). Contrary to Rothgeb's assertions, the ALJ's conclusion that Rothgeb was moderately limited in social functioning does not indicate a comprehensive failure by the ALJ to adequately consider the record as a whole.

In sum, the ALJ did not mischaracterize or misconstrue the record. Her opinion is supported by substantial evidence, and she committed no legal error in reaching her decision. Therefore, the court finds no grounds for reversal in this case. *See Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981) ("When we review [the Commissioner's] decision, we are limited to determining whether there is substantial evidence in the record considered as a whole to support his finding. 42 U.S.C. s 405(g). We may not reevaluate the evidence or substitute our judgment for his. *Goodman v. Richardson*, 448 F.2d 388 (5th Cir. 1971). We

do not, of course, act as automatons. We must scrutinize the record as a whole, *Lewis v. Weinberger*, 515 F.2d 584, 586-87 (5th Cir. 1975), and base our judgment on a fair examination of all that it contains.").

## V. Conclusion

For the reasons as stated, the court concludes that the decision of the Commissioner denying benefits to Rothgeb should be affirmed.  The Court will enter a separate final judgment.

A separate order will issue.

Done this 21st day of August, 2012.


　　　　　　　　　　　　　/s/Charles S. Coody　　　　　　　　　　
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE